## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "***Agreement***") is entered into as of November 14, 2022 (the "***Effective Date***") between Insurance Claims Services, Inc. (d/b/a Claimly), a Delaware corporation (the "***Company***"), and Reed Stephens ("***Employee***").

W I T N E S S E T H:

**WHEREAS,** the Company desires to retain the services of Employee as a Lead Developer for the Company; and

**WHEREAS,** the Company and Employee desire to enter into this Agreement as to the terms of Employee's employment with the Company.

**NOW, THEREFORE**, in consideration of the foregoing premises and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Employment. Employee's employment hereunder shall commence as of the Effective Date.  Employee's employment is at will; the period of service from the Effective Date through his last day of employment is the "***Employment Term***."

2.      Duties.

(a)      Duties.  During the Employment Term, Employee shall serve as a Lead Developer for the Company, reporting directly to the Chief Executive Officer (the "***CEO***") and shall have the duties, responsibilities and authority as are commensurate with Employee's position and reasonably designated by the Company's Chief Executive Officer. Employee's principal place of employment shall be in New Orleans, Louisiana, provided that Employee understands and agrees that Employee may be required to travel on a reasonable basis from time to time for business purposes, subject to the Company's travel policy.

(b)      Performance.  Employee shall report to the CEO and shall devote his full business time, energy, business judgment, knowledge and skill and the Employee's best business efforts to the performance of Employee's duties to the Company.  Employee shall (i) perform his duties and responsibilities hereunder faithfully and to the best of his abilities in a diligent manner and in accordance with the Company's policies and applicable law, (ii) use his best efforts to promote the success of the Company, (iii) not do anything, or permit anything to be done at his direction, inconsistent with his duties to the Company or opposed to its best interests, and (iv) cooperate fully with, and perform the duties reasonably assigned by, the CEO consistent with Employee's position in the advancement of the best interests of the Company.

3.      Compensation and Benefits.

(a)      Compensation.  For services performed during the Employment Term, Employee's Compensation shall be determined in accordance with Exhibit A attached hereto.

(b)      Benefits.  During the Employment Term, Employee shall be entitled to participate in the Company's employee benefit programs that the Company has adopted or may adopt, maintain or contribute to for the benefit of its senior Employees, subject to satisfying the applicable eligibility requirements, and except to the extent such plans are duplicative of the benefits otherwise provided hereunder (collectively, the "***Benefits***").  Employee's participation in such Benefits will be subject to the

EXHIBIT

4

terms of the applicable plan documents and generally applicable Company policies. Employee acknowledges that the Company reserves the right to change its Benefits from time to time, including any amendment, modification or termination of any Benefit, and the Company's right to make such changes shall not be restricted by, or violative of, this Agreement.

(c)     Expenses.  The Company shall reimburse Employee for all reasonable out of pocket and business operating expenses incurred by him in the course of performing his duties under this Agreement which are consistent with the Company's policies in effect from time to time, as established by the Board of Directors of the Company, with respect to travel, entertainment and other business expenses ("**_Expenses_**"), subject to the Company's requirements with respect to reporting and documentation of such Expenses.

4.     Restrictive Covenants.

(a)     Confidentiality.  Employee acknowledges that the Confidential Information (as defined below) is a valuable, special, sensitive and unique asset of the business of the Company, the continued confidentiality of which is essential to the continuation of its business, and the improper disclosure or use of which could severely and irreparably damage the Company.  Employee agrees, for and on behalf of himself, his legal representatives, and his successors and assigns that all Confidential Information is the property of the Company (and not of Employee).  Employee further agrees that Employee (i) will continue to keep all Confidential Information strictly confidential and not disclose the Confidential Information to any other person or entity and (ii) shall not, directly or indirectly, disclose, communicate or divulge to any Person, or use or cause or authorize any Person to use any Confidential Information, except as may be used in the performance of his duties hereunder in compliance with this Agreement. "**_Confidential Information_**" means all information, data and items relating to the Company (or any of their customers) which is valuable, confidential or proprietary, including, without limitation, information relating to the Company's software, software code, accounts, receivables, customers and customer lists and data, prospective customers and prospective customer lists and data, Inventions (as defined below), vendors and vendor lists and data, business methods and procedures, pricing techniques, business leads, budgets, memoranda, correspondence, designs, plans, schematics, patents, copyrights, equipment, tools, works of authorship, reports, records, processes, pricing, costs, products, services, margins, systems, software, service data, inventions, analyses, plans, business leads, intellectual property, writings, trade secrets, manuals, training materials and methods, sales and marketing materials, and compilations of and other items derived (in whole or in part) from the foregoing.  Confidential Information may be in either human, electronic or computer readable form.  Notwithstanding the foregoing, "Confidential Information" shall not include information that: (i) becomes publicly known without breach of Employee's obligations under this Section 4(a), or (ii) is required to be disclosed by law or by court order or government order; provided, however, that if Employee is required to disclose any Confidential Information pursuant to any law, court order or government order, (x) Employee shall promptly notify the Company of any such requirement so that the Company may seek an appropriate protective order or waive compliance with the provisions of this Agreement, (y) Employee shall reasonably cooperate with the Company to obtain such a protective order at the Company's cost and expense, and (z) if such order is not obtained, or the Company waives compliance with the provisions of this Section 4(a), Employee shall disclose only that portion of the Confidential Information which Employee is advised by counsel that Employee is legally required to so disclose and will exercise commercially reasonable efforts to obtain assurance that confidential treatment will be accorded the information so disclosed. Employee agrees to promptly return the Confidential Information to the Company's headquarters upon termination or cessation of his employment with Company.  Employee will notify the Company promptly and in writing of any circumstances of which Employee has knowledge relating to any possession or use of any Confidential Information by any Person other than those authorized by the terms of this Agreement.

PD.39718868.3

(b)    Return of Company Property; Cooperation.  Employee will deliver to the Company at the termination or expiration of his employment with the Company, or at any other time the Company may request, all equipment, files, property, memoranda, notes, plans, records, reports, computer tapes, printouts, Confidential Information, Inventions, software, documents and data (and all electronic, paper or other copies thereof) belonging to the Company or any of its affiliates, which Employee may then possess or have under Employee's control. Employee agrees that, during his employment and following the termination of Employee's employment for any reason, Employee will cooperate at the request of the Company in the defense or prosecution of any lawsuits or claims in which the Company or their respective officers, directors or executives may be or become involved and in connection with any internal investigation or administrative, regulatory or judicial proceeding, in each case which relates to matters occurring while Employee was employed by the Company, other than actions or causes of action between Employee and a member of the Company.  The Company shall, upon presentation of appropriate documentation, pay or reimburse Employee for all reasonable out-of-pocket expenses incurred by Employee in complying with this Section 4(b).

(c)    Non-Competition.  During the Restricted Period (as defined below), the Employee shall not, directly or indirectly, enter into the employment of, render any services to, engage, manage, operate, join, or own, lend money or otherwise offer other assistance to or participate in or be connected with, as an officer, director, executive, principal, agent, creditor, proprietor, representative, stockholder, partner, associate, consultant, sole proprietor or otherwise, any Person (as hereinafter defined) that, directly or indirectly, is engaged in the Business or competes with the Company, anywhere in the Restricted Area (as hereinafter defined).  During the Restricted Period and thereafter, Employee shall not, directly or indirectly, use any name which is similar to any corporate name of, or any trade name, service mark, trademark, logo or insignia used by the Company or any of its affiliates, other than in furtherance of the Company's Business during Employee's employment with the Company.  "***Business***" means any business in which the Company engages during the Employment Term.  "***Restricted Area***" means each of the following states or territories: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and Washington, D.C. and the parishes of Orleans, Jefferson, St. Tammany, St. Bernard, St. Charles, Lafourche and Plaquemines. "***Restricted Period***" means while Employee is employed by the Company and 24 months following Employee's termination of employment or services with the Company. "***Person***" means and includes an individual, a partnership, a limited partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group and a governmental entity. The provisions of this Section 4(c) shall not prevent Employee from acquiring or holding publicly traded stock or other public securities of any company, including a competing company, so long as Employee's ownership does not exceed two percent (2%) of the outstanding securities of such company.

(d)    Non-Solicitation; Non-Disparagement.  During the Restricted Period, Employee shall not, without the prior written consent of the Company, which consent will not be unreasonably withheld (as determined by the Company in its sole discretion), directly or indirectly, whether for his own account or for the account of any Person, solicit, attempt to solicit, endeavor to entice away from the Company, attempt to hire, hire, deal with, attempt to attract business from, accept business from, or otherwise interfere with (whether by reason of cancellation, withdrawal, modification of relationship or otherwise) any actual or prospective relationship of the Company or its affiliates (i) who is or was within one (1) year employed by or otherwise engaged to perform services for the Company, including, but not limited to, any independent contractor or representative or (ii) who is or was within one (1) year an actual or bona fide prospective vendor, customer, landlord, client or other business relationship of the Company.

3

PD.39718868.3

Employee agrees that he will never make or publish any statement or communication which is false or disparaging with respect to the Company and/or its officers, directors, advisors, members, managers, or executives. Employee shall not be prohibited from providing truthful testimony given in response to a lawful subpoena or similar court or governmental order, or in connection with other legal proceedings.

        (e)      <u>Inventions.</u>

        (i)      Employee acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments, software, know-how, processes, techniques, methods, works of authorship and other work product, whether patentable or unpatentable (collectively, "***Ideas***"), (A) that are made or conceived by Employee, solely or jointly with others, during the Employment Term and (1) are reduced to practice, created, invented, designed, developed, contributed to, or improved with the use of any Company resources or are within the scope of Employee's work with the Company or (2) relate to the business, operations or actual or demonstrably anticipated research or development of the Company or (B) suggested by any work that Employee performs in connection with the Company, either while performing Employee's duties with the Company or on Employee's own time, but only insofar as the Ideas are related to Employee's work as an employee or other service provider to the Company, (collectively, the "***Inventions***") shall belong exclusively to the Company (or its designee), whether or not patent or other applications for intellectual property protection are filed thereon. Employee will keep full and complete written records (the "***Records***"), in the manner prescribed by the Company, of all Inventions, and will reasonably promptly disclose all Inventions completely and in writing to the Company. The Records shall be the sole and exclusive property of the Company, and Employee will surrender them upon the termination of the Employment Term, or upon the Company's request. Employee irrevocably conveys, transfers and assigns to the Company the Inventions and all patents or other intellectual property rights that may issue thereon in any and all countries, whether during or subsequent to the Employment Term, together with the right to file, in Employee's name or in the name of the Company (or its designee), applications for patents and equivalent rights (the "***Applications***"). Employee will, at any time during and subsequent to the Employment Term, make such Applications, sign such papers, take all rightful oaths, and perform all other acts as may be requested from time to time by the Company to perfect, record, enforce, protect, patent or register the Company's rights in the Inventions, all without additional compensation to Employee from the Company. Employee will also execute assignments to the Company (or its designee) of the Applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Company's benefit, all without additional compensation to Employee from the Company, but entirely at the Company's expense.

        (ii)      In addition, the Inventions will be deemed "Work for Hire," as such term is defined under the copyright laws of the United States, on behalf of the Company and Employee agrees that the Company will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to Employee. If the Inventions, or any portion thereof, are deemed not to be Work for Hire, or the rights in such Inventions do not otherwise automatically vest in the Company, Employee hereby irrevocably conveys, transfers and assigns to the Company, all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of Employee's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to

4

the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom. In addition, Employee hereby waives any so-called "moral rights" with respect to the Inventions. To the extent that Employee has any rights in the results and proceeds of Employee's service to the Company that cannot be assigned in the manner described herein, Employee agrees to unconditionally waive the enforcement of such rights. Employee hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents and other registrations for intellectual property that may issue thereon, including, without limitation, any rights that would otherwise accrue to Employee's benefit by virtue of Employee being an employee of or other service provider to the Company.

(iii)    Limited Licenses

(A)    If Employee incorporates into a Company product, process, system, code, or machine or into any Invention any Ideas that are not Inventions and that Employee owns or otherwise has rights in ("**Employee IP**"), Employee hereby grants to Company a non-exclusive, royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Employee IP as part of or in connection with such product, process, system, code, machine or Invention.

(B)    For any Invention that Employee can demonstrate with contemporaneous evidence is reduced to practice, created, invented, designed, developed, contributed to or improved without Employee's use of any Company resources and outside the scope of Employee's work with the Company, the Company grants to Employee a non-exclusive, royalty-free, perpetual, worldwide license to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Invention solely outside of the Company's Exclusive Fields of Use (defined below) and subject the Company's Right of First Offer (also defined below) (each a "**Licensed Invention**").  The **Company's Exclusive Fields of Use** means industries, technologies, research and development related to insurance; insurance claims; insurtech; insurance claim service providers; property restoration or remediation; construction, repair, or property financing; and any data or data analytics related to the foregoing fields.

(C)    Before Employee solicits interest in any transaction, or enters into a bona fide discussion regarding the definitive terms and conditions of any transaction, the effect of which is to sell, transfer, or sublicense any rights to any Licensed Invention, the Employee shall promptly notify the Company. The Employee's notice will identify the specific Licensed Invention(s) that would be the subject of the sale, transfer, or sublicense and the identity of a prospective purchaser. Upon receipt of such notice, the Company will have ten (10) days (the "**ROFO Notice Period**") to notify the Employee if it is interested in exercising its right of first offer with respect to any or all of the designated Licensed Inventions. If the Company so notifies the Employee during such period, then the parties will negotiate with one another in good faith exclusively for a period of sixty (60) days (the "**ROFO Negotiation Period**") regarding the terms and conditions pursuant to which Company would acquire Employee's rights to Licensed Inventions, and the Employee will not negotiate with any third party for the sale or transfer of such Licensed Inventions during the ROFO Negotiation Period. If the Company does not notify the Employee that it is exercising its right of first offer during the ROFO Notice Period, or if the Company provides such notice during ROFO Notice Period but the parties fail to agree on the terms of a sale or transfer of the applicable Licensed Invention(s) during the ROFO Negotiation Period, then after the end of the ROFO Notice Period or ROFO Negotiation Period, as the

5

case may be, the Employee will be free to negotiate with third parties to sell, transfer, or sublicense such Licensed Invention(s) to a third party, but only on terms and conditions (including price) that, in the aggregate, are more favorable to the Employee than those offered by the Company for the transfer of such Licensed Invention(s). If Employee does not sell, transfer, or sublicense such Licensed Invention(s) within 180 days of the end of the ROFO Notice Period or ROFO Negotiation Period, as the case may be, Employee will be obligated to comply with the obligations set forth in this 4(e)(iii)(C) with respect to any future sale, transfer, or sublicense of such Licensed Invention(s).

(f)    Rationale for and Scope of Covenants.  Employee agrees that his services hereunder are of a special, unique, extraordinary and intellectual character and his position with the Company places him in a position of confidence and trust with the customers, suppliers and executives of the Company. Employee and the Company agree that in the course of employment hereunder, Employee has and will continue to develop a personal relationship with the Company's vendors, customers or clients and other business relationships, and a knowledge of their affairs and requirements as well as confidential and proprietary information developed by the Company after the date of this Agreement.  Employee acknowledges that the Company's relationships with its established clientele may therefore be placed in Employee's hands in confidence and trust.  Employee consequently agrees that it is reasonable and necessary for the protection of the goodwill, confidential and proprietary information, and legitimate business interests of the Company and its affiliates that Employee make the covenants contained herein, that the covenants are a material inducement for the Company to employ or continue to employ Employee and to enter into this Agreement, and that the covenants are given as an integral part of and incident to this Agreement.  If any of the covenants contained in this Section 4 are held to be invalid or unenforceable due to the unreasonableness of the time, geographic area, or range of activities covered by such covenants, such covenants shall nevertheless be enforced to the maximum extent permitted by law and effective for such period of time, over such geographical area, or for such range of activities as may be determined to be reasonable by a court of competent jurisdiction and the parties hereby consent and agree that the scope of such covenants may be judicially modified, accordingly, in any proceeding brought to enforce such covenants.

(g)    Remedies. Employee consents and agrees that if he violates any covenants contained in this Section 4, the Company would sustain irreparable harm and, therefore, in addition to any other remedies which may be available to it, the Company shall be entitled to seek an injunction restraining Employee from committing or continuing any such violation of this Section 4.  Nothing in this Agreement shall be construed as prohibiting the Company or Employee from pursuing any other remedy or remedies including, without limitation, recovery of damages.  Employee acknowledges that the Company are an express third-party beneficiary of this Agreement and that they may enforce these rights as third party beneficiaries.  These restrictive covenants shall be construed as agreements independent of any other provision in this Agreement or in any other agreement.  The Company has fully performed all obligations entitling it to the restrictive covenants, and the restrictive covenants therefore are not executory or otherwise subject to rejection and are enforceable under the bankruptcy code.  In the event of the breach by Employee of any of the provisions of this Section 4, the Company shall be entitled, in addition to all other available rights and remedies, to withhold any or all of the amounts agreed to be paid to Employee hereunder and the Company shall also be entitled to terminate his employment status hereunder and the provision of any benefits and compensation conditioned upon such status.  Notwithstanding any provision of this Agreement to the contrary, Employee shall not be entitled to any payments pursuant hereto during any period in which Employee is violating any of his obligations under this Section 4.  The Company may assign the restrictive covenants set forth in this Section 4 in connection with the acquisition of all or a part of the assets of the Company, and any such assignee or successor shall be entitled to enforce the rights and remedies set forth in this Section 4.  Employee acknowledges and agrees that the Restricted Period shall be tolled on a day-

PD.39718868.3

for-day basis for all periods in which Employee is found to have violated the terms of this Section 4 so that the Company receives the full benefit of such periods to which Employee has agreed.

(h)    Whistleblower Protection.  Nothing in this Agreement is intended to conflict with the whistleblower provisions of any United States federal, state or local law or regulation, including but not limited to Rule 21F-17 of the Securities Exchange Act of 1934 or § 1833(b) of the Defend Trade Secrets Act of 2016. Accordingly, notwithstanding anything to the contrary herein, nothing in this Agreement shall prohibit Employee from reporting possible violations of United States federal, state or local law or regulation to any United States federal, state or local governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or to an attorney, or from making other disclosures that are protected under the whistleblower provisions of federal law or regulation, or from disclosing trade secrets and other confidential information in the course of such reporting; provided, that Employee uses his reasonable best efforts to (i) disclose only information that is reasonably related to such possible violations or that is requested by such agency or entity and (ii) requests that such agency or entity treat such information as confidential. Employee does not need the prior authorization from the Company to make any such reports or disclosures and is not required to notify the Company that it has made such reports or disclosures. In addition, Employee has the right to disclose trade secrets and other confidential information in a document filed in a lawsuit or other proceeding; provided, that the filing is made under seal and protected from public disclosure.

(i)    Survival.  Notwithstanding anything to the contrary set forth herein, the provisions of this Section 4 shall survive the termination or cessation of this Agreement or Employee's employment, irrespective of the reason for such termination or cessation.  Employee shall disclose and hereby agrees that the Company may disclose, the restrictions set forth in this Section 4 to any subsequent employer or potential employer of Employee during the two year period following the termination of Employee's employment with the Company.

5.    Compliance with Internal Revenue Code Section 409A.

(a)    General.  It is the intention of both the Company and Employee that the benefits and rights to which Employee could be entitled pursuant to this Agreement comply with Section 409A of the Internal Revenue Code, as amended from time to time, and its implementing regulations and guidance ("***Section 409A***"), to the extent that the requirements of Section 409A are applicable thereto, and the provisions of this Agreement shall be construed in a manner consistent with that intention. If Employee or the Company believes, at any time, that any such benefit or right that is subject to Section 409A does not so comply, it shall promptly advise the other and shall negotiate reasonably and in good faith to amend the terms of such benefits and rights such that they comply with Section 409A (with the most limited possible economic effect on Employee and on the Company).

(b)    Distributions on Account of Separation from Service.  If and to the extent required to comply with Section 409A, any payment or benefit required to be paid under this Agreement on account of termination of Employee's employment, service (or any other similar term) shall be made only in connection with a "separation from service" with respect to Employee within the meaning of Section 409A.

(c)    No Acceleration of Payments.   Neither the Company nor Employee, individually or in combination, may accelerate any payment or benefit that is subject to Section 409A, except in compliance with Section 409A and the provisions of this Agreement, and no amount that is subject to Section 409A shall be paid prior to the earliest date on which it may be paid without violating Section 409A. Notwithstanding anything herein to the contrary or otherwise, except to the extent any expense or reimbursement provided pursuant to this Agreement does not constitute a "deferral of compensation" within the meaning of Section 409A (i) the amount of expenses eligible for reimbursement provided to Employee

7

during any calendar year will not affect the amount of expenses eligible for reimbursement or in-kind benefits provided to Employee in any other calendar year, (ii) the reimbursements for expenses for which Employee is entitled to be reimbursed shall be made on or before the last day of the calendar year following the calendar year in which the applicable expense is incurred, (iii) the right to payment or reimbursement or in-kind benefits hereunder may not be liquidated or exchanged for any other benefit.

(d)    Installment Payments. For purposes of Section 409A, Employee's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

6.    Withholding.  The Company shall be entitled to deduct or withhold from any amounts owing to Employee any federal, state, local or foreign withholding taxes, excise tax, or employment taxes imposed with respect to Employee's compensation or other payments from the Company or Employee's ownership interest in the Company or any parent thereof. To the extent that any of the payments and benefits provided for under this Agreement together with any payments or benefits under any other agreement or arrangement between the Company or its affiliates or any parent thereof and Employee (collectively, the "***280G Payments***") would constitute a "parachute payment" within the meaning of Section 280G of the Internal Revenue Code, then the Company shall use its commercially reasonable efforts to cause the Company (or such other party or parties as may be necessary) to grant the equity holder consent required to approve such 280G Payments to preclude it from being subject to the excise tax imposed pursuant to Section 4999 of the Internal Revenue Code (the "***Excise Tax***"); provided, however, that Employee shall reasonably cooperate with the Company and shall take all actions and execute such documents and instruments (including without limitation waiver of payments and benefits) as shall be reasonably necessary to preclude imposition of the Excise Tax.  In the event that the Company is not capable of granting, or such other parties do not grant, the stockholder consent required to preclude the 280G Payments from being subject to the Excise Tax, or Employee does not take any action required to be taken by Employee to preclude the imposition of the Excise Tax, then the amount of the 280G Payments shall be reduced to the amount that would result in no imposition of the Excise Tax.

7.    Miscellaneous.

(a)    Submission to Jurisdiction; Consent to Service of Process.    Each party hereby expressly and irrevocably submits to the exclusive jurisdiction and exclusive venue of any federal or state court of competent jurisdiction located in the State of Louisiana for any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto shall be heard and determined in such courts.  Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection that such party may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each party hereby waives any defense of lack of personal jurisdiction in Louisiana. Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Entire Agreement; Amendments and Waivers.  This Agreement (including any schedules and exhibits hereto) and the agreements referenced herein or contemplated hereby represent the entire understanding and agreement between the parties hereto with respect to Employee's employment with the Company and can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by Employee, in the case of an amendment, supplement, modification or waiver sought to be enforced against Employee, or the

8

Company (other than an instrument signed by Employee on the Company's behalf), in the case of an amendment, supplement, modification or waiver sought to be enforced against the Company.  The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law. The parties agree that this Agreement is intended to, and hereby does, supersede any previous employment agreement(s) or arrangement(s) between Employee and the Company.

(c)     Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana without regard to conflicts of law principles thereof.

(d)     Section Headings.   The section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

(e)     Notices.   All notices and other communications under this Agreement shall be deemed to have been duly given (a) on the date of delivery, if delivered by hand, (b) on the date of transmission, if delivered by confirmed email, (c) on the first business day following the date of deposit, if delivered by guaranteed overnight delivery service, or (d) on the fourth business day following the date delivered or mailed by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Employee, to:

Reed Stephens
Reed.r.stephens@gmail.com

At the address shown in the books and records of the Company

If to Company, to:

Alston Walker
alston@brelly.com

AND

Will Bishop
william.bishop@phelps.com
365 Canal St # 2000, New Orleans, LA 70130

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

(f)     Severability.   If any provision of this Agreement is invalid, illegal or unenforceable, the balance of this Agreement shall remain in effect. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

PD.39718868.3

(g)    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile, .pdf or other electronic means shall be effective as delivery of a manually executed counterpart to the Agreement.

(h)    Remedies Cumulative.  Except as otherwise provided herein, no remedy herein conferred upon a party hereto is intended to be exclusive of any other remedy.  No single or partial exercise by a party hereto of any right, power or remedy hereunder shall preclude any other or further exercise thereof.  All remedies under this Agreement or otherwise afforded to any party, shall be cumulative and not alternative.

(i)    Interpretation.  When a reference is made in this Agreement to an article, section, paragraph, clause, schedule or exhibit, such reference shall be deemed to be to this Agreement unless otherwise indicated.  The text of all schedules is incorporated herein by reference.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  As used herein, words in the singular will be held to include the plural and vice versa (unless the context otherwise requires), words of one gender shall be held to include the other gender (or the neuter) as the context requires, and the terms "hereof", "herein", and "herewith" and words of similar import will, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(j)    Arm's Length Negotiations.  Each party herein expressly represents and warrants to all other parties hereto that (i) said party has had the opportunity to seek and has obtained the advice of its own legal, tax and business advisors before executing this Agreement, and (ii) this Agreement is the result of arm's length negotiations conducted by and among the parties hereto and their respective counsel.

(k)    Construction.  The parties hereto agree and acknowledge that they have jointly participated in the negotiation and drafting of this Agreement.  In the event of an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement.

(l)    Further Instruments and Actions.  The parties hereto agree to execute such further instruments and to take such further actions as may reasonably be necessary to carry out the intent of this Agreement.

(m)    Binding Effect; Assignment; Third-Party Beneficiaries.  Except as otherwise provided herein, this Agreement shall not be assigned by any party, and no party's obligations hereunder, or any of them, shall be delegated, without the consent of the other parties; provided that, the Company may assign this Agreement to any successor to all or substantially all of the business and/or assets of the Company, provided that the Company shall require such successor to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  Subject to the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.  There shall be no third party beneficiaries hereof except as expressly provided herein.

(n)    Representation by Employee.  Employee represents and warrants to the Company that he is not (and that he shall not become) a party to any agreement containing a non-competition provision or other restriction with respect to (i) the nature of any services or business which he is entitled or required

10

to perform or conduct for the Company under this Agreement, or (ii) the disclosure or use of any information which directly or indirectly relates to the nature of the business of the Company or the services to be rendered by Employee under this Agreement.  Employee further represents and warrants that the execution, delivery and performance of this Agreement by Employee does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Employee is a party or by which Employee is bound. Employee agrees not to enter into any agreement which would be inconsistent with any of the terms or conditions hereof.

*[Signature Page Follows]*

PD.39718868.3

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the date first written above.

**INSURANCE CLAIMS SERVICES, INC:**                    **EMPLOYEE:**

                                                        **Reed Stephens**

By: *Tobias Patch*
    Tobias Patch (Mar 29, 2023 16:17 CDT)               Signature: *Reed Stephens*
Name: Tobias Patch                                                  Reed Stephens (Mar 29, 2023 16:16 CDT)
Title: CEO                                              Date: 3/29/2023
Date: 03/29/2023

[Signature Page to Employment Agreement – R. Stephens]

PD.39718868.3

## <u>EXHIBIT A – COMPENSATION</u>

Beginning on the first full calendar month in which Employee is considered to be performing services under this Agreement Full-Time, Compensation shall be $87,500, annualized per year, for the first twenty-four (24) calendar months. After the expiration of twenty-four (24) calendar months, Employee's Full-Time compensation shall be reviewed by the CEO. Notwithstanding, Employee's Full-Time Compensation shall be eligible to be increased as determined by the CEO in his sole discretion.  All Compensation shall be subject to customary withholding and other appropriate deductions.

For the purposes of Compensation, Employee is deemed to be performing services "***<u>Full-Time</u>***" during the period in which Employee is exclusively working for the Company and not working directly or indirectly for third parties, or on his own account, even when the activities that could be carried out are not concurrent with those of the Company and even when such activities could be carried out outside of Employee's normal working hours; provided, however, that Employee is permitted to conclude the following existing obligations for the periods and times stated below.

| Client and Description | Remaining Obligation |
|---|---|
| Meli - Electronic will for items and media: | Approximately 25-50 hours total to be concluded before the end of 2024. |
| Dog House Nola - Dog friendly bar with app to open a dog park | Approximately 30 hours total. |

In addition, Employee may have the opportunity to spend about 80 hours building a website for Pan American Building.  Employee will accept this engagement only with Company's written consent.

Exhibit A

# Reed Stephens Employment Agreement (Execution 3.29.23)

Final Audit Report                                        2023-03-29

| | |
|---|---|
| Created: | 2023-03-29 |
| By: | Alston Walker (alston@brelly.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAI2XuAO1QNU5lp86pawGCrc6wllJHC9NZ |

## "Reed Stephens Employment Agreement (Execution 3.29.23)" History

Document created by Alston Walker (alston@brelly.com)
2023-03-29 - 7:16:39 PM GMT

Document emailed to reed@brelly.com for signature
2023-03-29 - 7:18:45 PM GMT

Email viewed by reed@brelly.com
2023-03-29 - 9:16:26 PM GMT

Signer reed@brelly.com entered name at signing as Reed Stephens
2023-03-29 - 9:16:53 PM GMT

Document e-signed by Reed Stephens (reed@brelly.com)
Signature Date: 2023-03-29 - 9:16:55 PM GMT - Time Source: server

Document emailed to Tobias Patch (tobias@brelly.com) for signature
2023-03-29 - 9:16:56 PM GMT

Email viewed by Tobias Patch (tobias@brelly.com)
2023-03-29 - 9:17:08 PM GMT

Document e-signed by Tobias Patch (tobias@brelly.com)
Signature Date: 2023-03-29 - 9:17:55 PM GMT - Time Source: server

Agreement completed.
2023-03-29 - 9:17:55 PM GMT

Names and email addresses are entered into the Acrobat Sign service by Acrobat Sign users and are unverified unless otherwise noted.

 Adobe Acrobat Sign

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "*Agreement*") is entered into as of January 18, 2023 (the "*Effective Date*") between Insurance Claims Services, Inc. (d/b/a Claimly), a Delaware corporation (the "*Company*"), and Alston Walker ("*Employee*").

## W I T N E S S E T H:

**WHEREAS,** the Company desires to retain the services of Employee as its Chief Marketing Officer and General Counsel of the Company; and

**WHEREAS,** the Company and Employee desire to enter into this Agreement as to the terms of Employee's employment with the Company.

**NOW, THEREFORE,** in consideration of the foregoing premises and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Employment. Employee's employment hereunder shall commence as of the Effective Date. Employee's employment is at will; the period of service from the Effective Date through his last day of employment is the "*Employment Term.*"

2.     Duties.

(a)     Duties. During the Employment Term, Employee shall serve as the Chief Marketing Officer and General Counsel of the Company, reporting directly to the Chief Executive Officer (the "*CEO*") and shall have the duties, responsibilities and authority as are commensurate with Employee's position and reasonably designated by the Company's Chief Executive Officer. Employee's principal place of employment shall be in New Orleans, Louisiana, provided that Employee understands and agrees that Employee may be required to travel on a reasonable basis from time to time for business purposes, subject to the Company's travel policy.

(b)     Performance. Employee shall report to the CEO and shall devote his full business time, energy, business judgment, knowledge and skill and the Employee's best business efforts to the performance of Employee's duties to the Company.  Employee shall (i) perform his duties and responsibilities hereunder faithfully and to the best of his abilities in a diligent manner and in accordance with the Company's policies and applicable law, (ii) use his best efforts to promote the success of the Company, (iii) not do anything, or permit anything to be done at his direction, inconsistent with his duties to the Company or opposed to its best interests, and (iv) cooperate fully with, and perform the duties reasonably assigned by, the CEO consistent with Employee's position in the advancement of the best interests of the Company.

3.     Compensation and Benefits.

(a)     Compensation. For services performed during the Employment Term, Employee's Compensation shall be determined in accordance with Exhibit A attached hereto.

(b)     Benefits. During the Employment Term, Employee shall be entitled to participate in the Company's employee benefit programs that the Company has adopted or may adopt, maintain or contribute to for the benefit of its senior Employees, subject to satisfying the applicable eligibility requirements, and except to the extent such plans are duplicative of the benefits otherwise provided

PD.39718868.3

hereunder (collectively, the "**_Benefits_**"). Employee's participation in such Benefits will be subject to the terms of the applicable plan documents and generally applicable Company policies. Employee acknowledges that the Company reserves the right to change its Benefits from time to time, including any amendment, modification or termination of any Benefit, and the Company's right to make such changes shall not be restricted by, or violative of, this Agreement.

(c)     Expenses. The Company shall reimburse Employee for all reasonable out of pocket and business operating expenses incurred by him in the course of performing his duties under this Agreement which are consistent with the Company's policies in effect from time to time, as established by the Board of Directors of the Company, with respect to travel, entertainment and other business expenses ("**_Expenses_**"), subject to the Company's requirements with respect to reporting and documentation of such Expenses.

4.     Restrictive Covenants.

(a)     Confidentiality. Employee acknowledges that the Confidential Information (as defined below) is a valuable, special, sensitive and unique asset of the business of the Company, the continued confidentiality of which is essential to the continuation of its business, and the improper disclosure or use of which could severely and irreparably damage the Company. Employee agrees, for and on behalf of himself, his legal representatives, and his successors and assigns that all Confidential Information is the property of the Company (and not of Employee). Employee further agrees that Employee (i) will continue to keep all Confidential Information strictly confidential and not disclose the Confidential Information to any other person or entity and (ii) shall not, directly or indirectly, disclose, communicate or divulge to any Person, or use or cause or authorize any Person to use any Confidential Information, except as may be used in the performance of his duties hereunder in compliance with this Agreement. "**_Confidential Information_**" means all information, data and items relating to the Company (or any of their customers) which is valuable, confidential or proprietary, including, without limitation, information relating to the Company's software, software code, accounts, receivables, customers and customer lists and data, prospective customers and prospective customer lists and data, Inventions (as defined below), vendors and vendor lists and data, business methods and procedures, pricing techniques, business leads, budgets, memoranda, correspondence, designs, plans, schematics, patents, copyrights, equipment, tools, works of authorship, reports, records, processes, pricing, costs, products, services, margins, systems, software, service data, inventions, analyses, plans, business leads, intellectual property, writings, trade secrets, manuals, training materials and methods, sales and marketing materials, and compilations of and other items derived (in whole or in part) from the foregoing. Confidential Information may be in either human, electronic or computer readable form. Notwithstanding the foregoing, "Confidential Information" shall not include information that: (i) becomes publicly known without breach of Employee's obligations under this Section 4(a), or (ii) is required to be disclosed by law or by court order or government order; provided, however, that if Employee is required to disclose any Confidential Information pursuant to any law, court order or government order, (x) Employee shall promptly notify the Company of any such requirement so that the Company may seek an appropriate protective order or waive compliance with the provisions of this Agreement, (y) Employee shall reasonably cooperate with the Company to obtain such a protective order at the Company's cost and expense, and (z) if such order is not obtained, or the Company waives compliance with the provisions of this Section 4(a), Employee shall disclose only that portion of the Confidential Information which Employee is advised by counsel that Employee is legally required to so disclose and will exercise commercially reasonable efforts to obtain assurance that confidential treatment will be accorded the information so disclosed. Employee agrees to promptly return the Confidential Information to the Company's headquarters upon termination or cessation of his employment with Company. Employee will notify the Company promptly and in writing of any circumstances of which Employee has knowledge relating to any possession or use of any Confidential Information by any Person other than those authorized by the terms of this Agreement.

2

PD.39718868.3

(b)    Return of Company Property; Cooperation. Employee will deliver to the Company at the termination or expiration of his employment with the Company, or at any other time the Company may request, all equipment, files, property, memoranda, notes, plans, records, reports, computer tapes, printouts, Confidential Information, Inventions, software, documents and data (and all electronic, paper or other copies thereof) belonging to the Company or any of its affiliates, which Employee may then possess or have under Employee's control. Employee agrees that, during his employment and following the termination of Employee's employment for any reason, Employee will cooperate at the request of the Company in the defense or prosecution of any lawsuits or claims in which the Company or their respective officers, directors or executives may be or become involved and in connection with any internal investigation or administrative, regulatory or judicial proceeding, in each case which relates to matters occurring while Employee was employed by the Company, other than actions or causes of action between Employee and a member of the Company.    The Company shall, upon presentation of appropriate documentation, pay or reimburse Employee for all reasonable out-of-pocket expenses incurred by Employee in complying with this Section 4(b).

(c)    Non-Competition. During the Restricted Period (as defined below), the Employee shall not, directly or indirectly, enter into the employment of, render any services to, engage, manage, operate, join, or own, lend money or otherwise offer other assistance to or participate in or be connected with, as an officer, director, executive, principal, agent, creditor, proprietor, representative, stockholder, partner, associate, consultant, sole proprietor or otherwise, any Person (as hereinafter defined) that, directly or indirectly, is engaged in the Business or competes with the Company, anywhere in the Restricted Area (as hereinafter defined).    During the Restricted Period and thereafter, Employee shall not, directly or indirectly, use any name which is similar to any corporate name of, or any trade name, service mark, trademark, logo or insignia used by the Company or any of its affiliates, other than in furtherance of the Company's Business during Employee's employment with the Company. "*Business*" means any business in which the Company engages during the Employment Term. "*Restricted Area*" means each of the following states or territories: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and Washington, D.C. and the parishes of Orleans, Jefferson, St. Tammany, St. Bernard, St. Charles, Lafourche and Plaquemines. "*Restricted Period*" means while Employee is employed by the Company and 24 months following Employee's termination of employment or services with the Company. "*Person*" means and includes an individual, a partnership, a limited partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group and a governmental entity. The provisions of this Section 4(c) shall not prevent Employee from acquiring or holding publicly traded stock or other public securities of any company, including a competing company, so long as Employee's ownership does not exceed two percent (2%) of the outstanding securities of such company.

(d)    Non-Solicitation; Non-Disparagement. During the Restricted Period, Employee shall not, without the prior written consent of the Company, which consent will not be unreasonably withheld (as determined by the Company in its sole discretion), directly or indirectly, whether for his own account or for the account of any Person, solicit, attempt to solicit, endeavor to entice away from the Company, attempt to hire, hire, deal with, attempt to attract business from, accept business from, or otherwise interfere with (whether by reason of cancellation, withdrawal, modification of relationship or otherwise) any actual or prospective relationship of the Company or its affiliates with any Person (i) who is or was within one (1) year employed by or otherwise engaged to perform services for the Company, including, but not limited to, any independent contractor or representative or (ii) who is or was within one (1) year an actual or bona fide prospective vendor, customer, landlord, client or other business relationship

3

PD.39718868.3

of the Company. Employee agrees that he will never make or publish any statement or communication which is false or disparaging with respect to the Company and/or its officers, directors, advisors, members, managers, or executives. Employee shall not be prohibited from providing truthful testimony given in response to a lawful subpoena or similar court or governmental order, or in connection with other legal proceedings.

     (e)     Inventions.

     (i)     Employee acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments, software, know-how, processes, techniques, methods, works of authorship and other work product, whether patentable or unpatentable, (A) that are reduced to practice, created, invented, designed, developed, contributed to, or improved with the use of any Company resources and/or within the scope of Employee's work with the Company or that relate to the business, operations or actual or demonstrably anticipated research or development of the Company, and that are made or conceived by Employee, solely or jointly with others, during the Employment Term, or (B) suggested by any work that Employee performs in connection with the Company, either while performing Employee's duties with the Company or on Employee's own time, but only insofar as the Inventions are related to Employee's work as an employee or other service provider to the Company, shall belong exclusively to the Company (or its designee), whether or not patent or other applications for intellectual property protection are filed thereon (collectively, the "***Inventions***"). Employee will keep full and complete written records (the "***Records***"), in the manner prescribed by the Company, of all Inventions, and will reasonably promptly disclose all Inventions completely and in writing to the Company. The Records shall be the sole and exclusive property of the Company, and Employee will surrender them upon the termination of the Employment Term, or upon the Company's request. Employee irrevocably conveys, transfers and assigns to the Company the Inventions and all patents or other intellectual property rights that may issue thereon in any and all countries, whether during or subsequent to the Employment Term, together with the right to file, in Employee's name or in the name of the Company (or its designee), applications for patents and equivalent rights (the "***Applications***"). Employee will, at any time during and subsequent to the Employment Term, make such Applications, sign such papers, take all rightful oaths, and perform all other acts as may be requested from time to time by the Company to perfect, record, enforce, protect, patent or register the Company's rights in the Inventions, all without additional compensation to Employee from the Company. Employee will also execute assignments to the Company (or its designee) of the Applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Company's benefit, all without additional compensation to Employee from the Company, but entirely at the Company's expense.

     (ii)     In addition, the Inventions will be deemed "Work for Hire," as such term is defined under the copyright laws of the United States, on behalf of the Company and Employee agrees that the Company will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to Employee. If the Inventions, or any portion thereof, are deemed not to be Work for Hire, or the rights in such Inventions do not otherwise automatically vest in the Company, Employee hereby irrevocably conveys, transfers and assigns to the Company, all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of Employee's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement,

4

or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom. In addition, Employee hereby waives any so-called "moral rights" with respect to the Inventions. To the extent that Employee has any rights in the results and proceeds of Employee's service to the Company that cannot be assigned in the manner described herein, Employee agrees to unconditionally waive the enforcement of such rights. Employee hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents and other registrations for intellectual property that may issue thereon, including, without limitation, any rights that would otherwise accrue to Employee's benefit by virtue of Employee being an employee of or other service provider to the Company.

(f)    Rationale for and Scope of Covenants. Employee agrees that his services hereunder are of a special, unique, extraordinary and intellectual character and his position with the Company places him in a position of confidence and trust with the customers, suppliers and executives of the Company. Employee and the Company agree that in the course of employment hereunder, Employee has and will continue to develop a personal relationship with the Company's vendors, customers or clients and other business relationships, and a knowledge of their affairs and requirements as well as confidential and proprietary information developed by the Company after the date of this Agreement. Employee acknowledges that the Company's relationships with its established clientele may therefore be placed in Employee's hands in confidence and trust. Employee consequently agrees that it is reasonable and necessary for the protection of the goodwill, confidential and proprietary information, and legitimate business interests of the Company and its affiliates that Employee make the covenants contained herein, that the covenants are a material inducement for the Company to employ or continue to employ Employee and to enter into this Agreement, and that the covenants are given as an integral part of and incident to this Agreement. If any of the covenants contained in this Section 4 are held to be invalid or unenforceable due to the unreasonableness of the time, geographic area, or range of activities covered by such covenants, such covenants shall nevertheless be enforced to the maximum extent permitted by law and effective for such period of time, over such geographical area, or for such range of activities as may be determined to be reasonable by a court of competent jurisdiction and the parties hereby consent and agree that the scope of such covenants may be judicially modified, accordingly, in any proceeding brought to enforce such covenants.

(g)    Remedies. Employee consents and agrees that if he violates any covenants contained in this Section 4, the Company would sustain irreparable harm and, therefore, in addition to any other remedies which may be available to it, the Company shall be entitled to seek an injunction restraining Employee from committing or continuing any such violation of this Section 4. Nothing in this Agreement shall be construed as prohibiting the Company or Employee from pursuing any other remedy or remedies including, without limitation, recovery of damages. Employee acknowledges that the Company are an express third-party beneficiary of this Agreement and that they may enforce these rights as third party beneficiaries. These restrictive covenants shall be construed as agreements independent of any other provision in this Agreement or in any other agreement. The Company has fully performed all obligations entitling it to the restrictive covenants, and the restrictive covenants therefore are not executory or otherwise subject to rejection and are enforceable under the bankruptcy code. In the event of the breach by Employee of any of the provisions of this Section 4, the Company shall be entitled, in addition to all other available rights and remedies, to withhold any or all of the amounts agreed to be paid to Employee hereunder and the Company shall also be entitled to terminate his employment status hereunder and the provision of any benefits and compensation conditioned upon such status. Notwithstanding any provision of this Agreement to the contrary, Employee shall not be entitled to any payments pursuant hereto during any period in which Employee is violating any of his obligations under this Section 4. The Company may assign the restrictive covenants set forth in this Section 4 in connection with the acquisition of all or a part of the assets of the Company, and any such assignee or successor shall be entitled to enforce the rights and remedies set forth

5

in this <u>Section 4</u>. Employee acknowledges and agrees that the Restricted Period shall be tolled on a day-for-day basis for all periods in which Employee is found to have violated the terms of this <u>Section 4</u> so that the Company receives the full benefit of such periods to which Employee has agreed.

(h)    <u>Whistleblower Protection.</u> Nothing in this Agreement is intended to conflict with the whistleblower provisions of any United States federal, state or local law or regulation, including but not limited to Rule 21F-17 of the Securities Exchange Act of 1934 or § 1833(b) of the Defend Trade Secrets Act of 2016. Accordingly, notwithstanding anything to the contrary herein, nothing in this Agreement shall prohibit Employee from reporting possible violations of United States federal, state or local law or regulation to any United States federal, state or local governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or to an attorney, or from making other disclosures that are protected under the whistleblower provisions of federal law or regulation, or from disclosing trade secrets and other confidential information in the course of such reporting; provided, that Employee uses his reasonable best efforts to (i) disclose only information that is reasonably related to such possible violations or that is requested by such agency or entity and (ii) requests that such agency or entity treat such information as confidential. Employee does not need the prior authorization from the Company to make any such reports or disclosures and is not required to notify the Company that it has made such reports or disclosures. In addition, Employee has the right to disclose trade secrets and other confidential information in a document filed in a lawsuit or other proceeding; provided, that the filing is made under seal and protected from public disclosure.

(i)    <u>Survival</u>. Notwithstanding anything to the contrary set forth herein, the provisions of this <u>Section 4</u> shall survive the termination or cessation of this Agreement or Employee's employment, irrespective of the reason for such termination or cessation. Employee shall disclose and hereby agrees that the Company may disclose, the restrictions set forth in this <u>Section 4</u> to any subsequent employer or potential employer of Employee during the two year period following the termination of Employee's employment with the Company.

5.    <u>Compliance with Internal Revenue Code Section 409A.</u>

(a)    <u>General.</u> It is the intention of both the Company and Employee that the benefits and rights to which Employee could be entitled pursuant to this Agreement comply with Section 409A of the Internal Revenue Code, as amended from time to time, and its implementing regulations and guidance ("***Section 409A***"), to the extent that the requirements of Section 409A are applicable thereto, and the provisions of this Agreement shall be construed in a manner consistent with that intention. If Employee or the Company believes, at any time, that any such benefit or right that is subject to Section 409A does not so comply, it shall promptly advise the other and shall negotiate reasonably and in good faith to amend the terms of such benefits and rights such that they comply with Section 409A (with the most limited possible economic effect on Employee and on the Company).

(b)    <u>Distributions on Account of Separation from Service.</u> If and to the extent required to comply with Section 409A, any payment or benefit required to be paid under this Agreement on account of termination of Employee's employment, service (or any other similar term) shall be made only in connection with a "separation from service" with respect to Employee within the meaning of Section 409A.

(c)    <u>No Acceleration of Payments.</u> Neither the Company nor Employee, individually or in combination, may accelerate any payment or benefit that is subject to Section 409A, except in compliance with Section 409A and the provisions of this Agreement, and no amount that is subject to Section 409A shall be paid prior to the earliest date on which it may be paid without violating Section 409A. Notwithstanding anything herein to the contrary or otherwise, except to the extent any expense or reimbursement provided pursuant to this Agreement does not constitute a "deferral of compensation" within

PD.39718868.3

the meaning of Section 409A (i) the amount of expenses eligible for reimbursement provided to Employee during any calendar year will not affect the amount of expenses eligible for reimbursement or in-kind benefits provided to Employee in any other calendar year, (ii) the reimbursements for expenses for which Employee is entitled to be reimbursed shall be made on or before the last day of the calendar year following the calendar year in which the applicable expense is incurred, (iii) the right to payment or reimbursement or in-kind benefits hereunder may not be liquidated or exchanged for any other benefit.

(d)    Installment Payments. For purposes of Section 409A, Employee's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

6.    Withholding. The Company shall be entitled to deduct or withhold from any amounts owing to Employee any federal, state, local or foreign withholding taxes, excise tax, or employment taxes imposed with respect to Employee's compensation or other payments from the Company or Employee's ownership interest in the Company or any parent thereof. To the extent that any of the payments and benefits provided for under this Agreement together with any payments or benefits under any other agreement or arrangement between the Company or its affiliates or any parent thereof and Employee (collectively, the "**_280G Payments_**") would constitute a "parachute payment" within the meaning of Section 280G of the Internal Revenue Code, then the Company shall use its commercially reasonable efforts to cause the Company (or such other party or parties as may be necessary) to grant the equity holder consent required to approve such 280G Payments to preclude it from being subject to the excise tax imposed pursuant to Section 4999 of the Internal Revenue Code (the "**_Excise Tax_**"); provided, however, that Employee shall reasonably cooperate with the Company and shall take all actions and execute such documents and instruments (including without limitation waiver of payments and benefits) as shall be reasonably necessary to preclude imposition of the Excise Tax. In the event that the Company is not capable of granting, or such other parties do not grant, the stockholder consent required to preclude the 280G Payments from being subject to the Excise Tax, or Employee does not take any action required to be taken by Employee to preclude the imposition of the Excise Tax, then the amount of the 280G Payments shall be reduced to the amount that would result in no imposition of the Excise Tax.

7.    Miscellaneous.

(a)    Submission to Jurisdiction; Consent to Service of Process.    Each party hereby expressly and irrevocably submits to the exclusive jurisdiction and exclusive venue of any federal or state court of competent jurisdiction located in the State of Louisiana for any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto shall be heard and determined in such courts. Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection that such party may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each party hereby waives any defense of lack of personal jurisdiction in Louisiana. Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Entire Agreement; Amendments and Waivers. This Agreement (including any schedules and exhibits hereto) and the agreements referenced herein or contemplated hereby represent the entire understanding and agreement between the parties hereto with respect to Employee's employment with the Company and can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by Employee, in the case of

7

an amendment, supplement, modification or waiver sought to be enforced against Employee, or the Company (other than an instrument signed by Employee on the Company's behalf), in the case of an amendment, supplement, modification or waiver sought to be enforced against the Company. The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law. The parties agree that this Agreement is intended to, and hereby does, supersede any previous employment agreement(s) or arrangement(s) between Employee and the Company.

        (c)     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana without regard to conflicts of law principles thereof.

        (d)     Section Headings.  The section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

        (e)     Notices.  All notices and other communications under this Agreement shall be deemed to have been duly given (a) on the date of delivery, if delivered by hand, (b) on the date of transmission, if delivered by confirmed email, (c) on the first business day following the date of deposit, if delivered by guaranteed overnight delivery service, or (d) on the fourth business day following the date delivered or mailed by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Employee, to:

Alston Walker
alstonw@gmail.com and alston@brelly.com
7936 Zimpel Street New Orleans, LA 70118

At the address shown in the books and records of the Company

If to Company, to:

Tobias Patch
tobias@brelly.com
c/o Will Bishop
william.bishop@phelps.com
365 Canal St # 2000, New Orleans, LA 70130

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

        (f)     Severability.  If any provision of this Agreement is invalid, illegal or unenforceable, the balance of this Agreement shall remain in effect. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

8

PD.39718868.3

(g)    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile, .pdf or other electronic means shall be effective as delivery of a manually executed counterpart to the Agreement.

(h)    Remedies Cumulative. Except as otherwise provided herein, no remedy herein conferred upon a party hereto is intended to be exclusive of any other remedy. No single or partial exercise by a party hereto of any right, power or remedy hereunder shall preclude any other or further exercise thereof. All remedies under this Agreement or otherwise afforded to any party, shall be cumulative and not alternative.

(i)    Interpretation. When a reference is made in this Agreement to an article, section, paragraph, clause, schedule or exhibit, such reference shall be deemed to be to this Agreement unless otherwise indicated. The text of all schedules is incorporated herein by reference. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." As used herein, words in the singular will be held to include the plural and vice versa (unless the context otherwise requires), words of one gender shall be held to include the other gender (or the neuter) as the context requires, and the terms "hereof", "herein", and "herewith" and words of similar import will, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(j)    Arm's Length Negotiations. Each party herein expressly represents and warrants to all other parties hereto that (i) said party has had the opportunity to seek and has obtained the advice of its own legal, tax and business advisors before executing this Agreement, and (ii) this Agreement is the result of arm's length negotiations conducted by and among the parties hereto and their respective counsel.

(k)    Construction. The parties hereto agree and acknowledge that they have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement.

(l)    Further Instruments and Actions. The parties hereto agree to execute such further instruments and to take such further actions as may reasonably be necessary to carry out the intent of this Agreement.

(m)    Binding Effect; Assignment; Third-Party Beneficiaries. Except as otherwise provided herein, this Agreement shall not be assigned by any party, and no party's obligations hereunder, or any of them, shall be delegated, without the consent of the other parties; provided that, the Company may assign this Agreement to any successor to all or substantially all of the business and/or assets of the Company, provided that the Company shall require such successor to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. Subject to the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. There shall be no third party beneficiaries hereof except as expressly provided herein.

(n)    Representation by Employee. Employee represents and warrants to the Company that he is not (and that he shall not become) a party to any agreement containing a non-competition provision or other restriction with respect to (i) the nature of any services or business which he is entitled or required

9

PD.39718868.3

Zoho Sign Document ID: 2EA708F6-R0RN8ADD45WFV3LROVSYBDVN5NMP1YLVETXNXC8DMDO

to perform or conduct for the Company under this Agreement, or (ii) the disclosure or use of any information which directly or indirectly relates to the nature of the business of the Company or the services to be rendered by Employee under this Agreement. Employee further represents and warrants that the execution, delivery and performance of this Agreement by Employee does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Employee is a party or by which Employee is bound. Employee agrees not to enter into any agreement which would be inconsistent with any of the terms or conditions hereof.

*[Signature Page Follows]*

PD.39718868.3

10

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the date first written above.

**INSURANCE CLAIMS SERVICES, INC:**

**EMPLOYEE:**

**ALSTON WALKER**

By: _Tobias Patch_

Name:_____

Title:_____

Date:_____

Signature:_____

Date: _1-18-2023_

[Signature Page to Employment Agreement – A. Walker]

PD.39718868.3

## EXHIBIT A – COMPENSATION

Beginning on the first full calendar month in which Employee is considered to be performing services under this Agreement Full-Time, Compensation shall be $72,500.00, annualized per year, for the first twenty-four (24) calendar months. After the expiration of twenty-four (24) calendar months, Employee's Full-Time compensation shall be reviewed by the CEO. Notwithstanding, Employee's Full-Time Compensation shall be eligible to be increased as determined by the CEO in his sole discretion. All Compensation shall be subject to customary withholding and other appropriate deductions.

For the purposes of Compensation, Employee is deemed to be performing services "***Full-Time***" during the period in which Employee is exclusively working for the Company and not working directly or indirectly for third parties, or on his own account, even when the activities that could be carried out are not concurrent with those of the Company and even when such activities could be carried out outside of Employee's normal working hours.

Exhibit A

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "***Agreement***") is entered into as of November 14, 2022 (the "***Effective Date***") between Insurance Claims Services, Inc. (d/b/a Claimly), a Delaware corporation (the "***Company***"), and Harrison Fox ("***Employee***").

W I T N E S S E T H:

**WHEREAS,** the Company desires to retain the services of Employee as a Lead Developer for the Company; and

**WHEREAS,** the Company and Employee desire to enter into this Agreement as to the terms of Employee's employment with the Company.

**NOW, THEREFORE**, in consideration of the foregoing premises and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Employment. Employee's employment hereunder shall commence as of the Effective Date.  Employee's employment is at will; the period of service from the Effective Date through his last day of employment is the "***Employment Term***."

2.      Duties.

(a)      Duties.  During the Employment Term, Employee shall serve as a Lead Developer for the Company, reporting directly to the Chief Executive Officer (the "***CEO***") and shall have the duties, responsibilities and authority as are commensurate with Employee's position and reasonably designated by the Company's Chief Executive Officer. Employee's principal place of employment shall be in New Orleans, Louisiana, provided that Employee understands and agrees that Employee may be required to travel on a reasonable basis from time to time for business purposes, subject to the Company's travel policy.

(b)      Performance.  Employee shall report to the CEO and shall devote his full business time, energy, business judgment, knowledge and skill and the Employee's best business efforts to the performance of Employee's duties to the Company.  Employee shall (i) perform his duties and responsibilities hereunder faithfully and to the best of his abilities in a diligent manner and in accordance with the Company's policies and applicable law, (ii) use his best efforts to promote the success of the Company, (iii) not do anything, or permit anything to be done at his direction, inconsistent with his duties to the Company or opposed to its best interests, and (iv) cooperate fully with, and perform the duties reasonably assigned by, the CEO consistent with Employee's position in the advancement of the best interests of the Company.

3.      Compensation and Benefits.

(a)      Compensation.  For services performed during the Employment Term, Employee's Compensation shall be determined in accordance with Exhibit A attached hereto.

(b)      Benefits.  During the Employment Term, Employee shall be entitled to participate in the Company's employee benefit programs that the Company has adopted or may adopt, maintain or contribute to for the benefit of its senior Employees, subject to satisfying the applicable eligibility requirements, and except to the extent such plans are duplicative of the benefits otherwise provided hereunder (collectively, the "***Benefits***").  Employee's participation in such Benefits will be subject to the

terms of the applicable plan documents and generally applicable Company policies. Employee acknowledges that the Company reserves the right to change its Benefits from time to time, including any amendment, modification or termination of any Benefit, and the Company's right to make such changes shall not be restricted by, or violative of, this Agreement.

(c)    Expenses.  The Company shall reimburse Employee for all reasonable out of pocket and business operating expenses incurred by him in the course of performing his duties under this Agreement which are consistent with the Company's policies in effect from time to time, as established by the Board of Directors of the Company, with respect to travel, entertainment and other business expenses ("***Expenses***"), subject to the Company's requirements with respect to reporting and documentation of such Expenses.

4.    Restrictive Covenants.

(a)    Confidentiality.  Employee acknowledges that the Confidential Information (as defined below) is a valuable, special, sensitive and unique asset of the business of the Company, the continued confidentiality of which is essential to the continuation of its business, and the improper disclosure or use of which could severely and irreparably damage the Company.  Employee agrees, for and on behalf of himself, his legal representatives, and his successors and assigns that all Confidential Information is the property of the Company (and not of Employee).  Employee further agrees that Employee (i) will continue to keep all Confidential Information strictly confidential and not disclose the Confidential Information to any other person or entity and (ii) shall not, directly or indirectly, disclose, communicate or divulge to any Person, or use or cause or authorize any Person to use any Confidential Information, except as may be used in the performance of his duties hereunder in compliance with this Agreement. "***Confidential Information***" means all information, data and items relating to the Company (or any of their customers) which is valuable, confidential or proprietary, including, without limitation, information relating to the Company's software, software code, accounts, receivables, customers and customer lists and data, prospective customers and prospective customer lists and data, Inventions (as defined below), vendors and vendor lists and data, business methods and procedures, pricing techniques, business leads, budgets, memoranda, correspondence, designs, plans, schematics, patents, copyrights, equipment, tools, works of authorship, reports, records, processes, pricing, costs, products, services, margins, systems, software, service data, inventions, analyses, plans, business leads, intellectual property, writings, trade secrets, manuals, training materials and methods, sales and marketing materials, and compilations of and other items derived (in whole or in part) from the foregoing.  Confidential Information may be in either human, electronic or computer readable form.  Notwithstanding the foregoing, "Confidential Information" shall not include information that: (i) becomes publicly known without breach of Employee's obligations under this Section 4(a), or (ii) is required to be disclosed by law or by court order or government order; provided, however, that if Employee is required to disclose any Confidential Information pursuant to any law, court order or government order, (x) Employee shall promptly notify the Company of any such requirement so that the Company may seek an appropriate protective order or waive compliance with the provisions of this Agreement, (y) Employee shall reasonably cooperate with the Company to obtain such a protective order at the Company's cost and expense, and (z) if such order is not obtained, or the Company waives compliance with the provisions of this Section 4(a), Employee shall disclose only that portion of the Confidential Information which Employee is advised by counsel that Employee is legally required to so disclose and will exercise commercially reasonable efforts to obtain assurance that confidential treatment will be accorded the information so disclosed. Employee agrees to promptly return the Confidential Information to the Company's headquarters upon termination or cessation of his employment with Company.  Employee will notify the Company promptly and in writing of any circumstances of which Employee has knowledge relating to any possession or use of any Confidential Information by any Person other than those authorized by the terms of this Agreement.

(b)     Return of Company Property; Cooperation.  Employee will deliver to the Company at the termination or expiration of his employment with the Company, or at any other time the Company may request, all equipment, files, property, memoranda, notes, plans, records, reports, computer tapes, printouts, Confidential Information, Inventions, software, documents and data (and all electronic, paper or other copies thereof) belonging to the Company or any of its affiliates, which Employee may then possess or have under Employee's control. Employee agrees that, during his employment and following the termination of Employee's employment for any reason, Employee will cooperate at the request of the Company in the defense or prosecution of any lawsuits or claims in which the Company or their respective officers, directors or executives may be or become involved and in connection with any internal investigation or administrative, regulatory or judicial proceeding, in each case which relates to matters occurring while Employee was employed by the Company, other than actions or causes of action between Employee and a member of the Company.  The Company shall, upon presentation of appropriate documentation, pay or reimburse Employee for all reasonable out-of-pocket expenses incurred by Employee in complying with this Section 4(b).

(c)     Non-Competition.  During the Restricted Period (as defined below), the Employee shall not, directly or indirectly, enter into the employment of, render any services to, engage, manage, operate, join, or own, lend money or otherwise offer other assistance to or participate in or be connected with, as an officer, director, executive, principal, agent, creditor, proprietor, representative, stockholder, partner, associate, consultant, sole proprietor or otherwise, any Person (as hereinafter defined) that, directly or indirectly, is engaged in the Business or competes with the Company, anywhere in the Restricted Area (as hereinafter defined).  During the Restricted Period and thereafter, Employee shall not, directly or indirectly, use any name which is similar to any corporate name of, or any trade name, service mark, trademark, logo or insignia used by the Company or any of its affiliates, other than in furtherance of the Company's Business during Employee's employment with the Company.  "***Business***" means any business in which the Company engages during the Employment Term.  "***Restricted Area***" means each of the following states or territories: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and Washington, D.C. and the parishes of Orleans, Jefferson, St. Tammany, St. Bernard, St. Charles, Lafourche and Plaquemines. "***Restricted Period***" means while Employee is employed by the Company and 24 months following Employee's termination of employment or services with the Company. "***Person***" means and includes an individual, a partnership, a limited partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group and a governmental entity. The provisions of this Section 4(c) shall not prevent Employee from acquiring or holding publicly traded stock or other public securities of any company, including a competing company, so long as Employee's ownership does not exceed two percent (2%) of the outstanding securities of such company.

(d)     Non-Solicitation; Non-Disparagement.  During the Restricted Period, Employee shall not, without the prior written consent of the Company, which consent will not be unreasonably withheld (as determined by the Company in its sole discretion), directly or indirectly, whether for his own account or for the account of any Person, solicit, attempt to solicit, endeavor to entice away from the Company, attempt to hire, hire, deal with, attempt to attract business from, accept business from, or otherwise interfere with (whether by reason of cancellation, withdrawal, modification of relationship or otherwise) any actual or prospective relationship of the Company or its affiliates (i) who is or was within one (1) year employed by or otherwise engaged to perform services for the Company, including, but not limited to, any independent contractor or representative or (ii) who is or was within one (1) year an actual or bona fide prospective vendor, customer, landlord, client or other business relationship of the Company.

Employee agrees that he will never make or publish any statement or communication which is false or disparaging with respect to the Company and/or its officers, directors, advisors, members, managers, or executives.  Employee shall not be prohibited from providing truthful testimony given in response to a lawful subpoena or similar court or governmental order, or in connection with other legal proceedings.

(e)      Inventions.

(i)      Employee acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments, software, know-how, processes, techniques, methods, works of authorship and other work product, whether patentable or unpatentable (collectively, "***Ideas***"), (A) that are made or conceived by Employee, solely or jointly with others, during the Employment Term and (1) are reduced to practice, created, invented, designed, developed, contributed to, or improved with the use of any Company resources or are within the scope of Employee's work with the Company or (2) relate to the business, operations or actual or demonstrably anticipated research or development of the Company or (B) suggested by any work that Employee performs in connection with the Company, either while performing Employee's duties with the Company or on Employee's own time, but only insofar as the Ideas are related to Employee's work as an employee or other service provider to the Company, (collectively, the "***Inventions***") shall belong exclusively to the Company (or its designee), whether or not patent or other applications for intellectual property protection are filed thereon. Employee will keep full and complete written records (the "***Records***"), in the manner prescribed by the Company, of all Inventions, and will reasonably promptly disclose all Inventions completely and in writing to the Company. The Records shall be the sole and exclusive property of the Company, and Employee will surrender them upon the termination of the Employment Term, or upon the Company's request. Employee irrevocably conveys, transfers and assigns to the Company the Inventions and all patents or other intellectual property rights that may issue thereon in any and all countries, whether during or subsequent to the Employment Term, together with the right to file, in Employee's name or in the name of the Company (or its designee), applications for patents and equivalent rights (the "***Applications***"). Employee will, at any time during and subsequent to the Employment Term, make such Applications, sign such papers, take all rightful oaths, and perform all other acts as may be requested from time to time by the Company to perfect, record, enforce, protect, patent or register the Company's rights in the Inventions, all without additional compensation to Employee from the Company. Employee will also execute assignments to the Company (or its designee) of the Applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Company's benefit, all without additional compensation to Employee from the Company, but entirely at the Company's expense.

(ii)      In addition, the Inventions will be deemed "Work for Hire," as such term is defined under the copyright laws of the United States, on behalf of the Company and Employee agrees that the Company will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to Employee. If the Inventions, or any portion thereof, are deemed not to be Work for Hire, or the rights in such Inventions do not otherwise automatically vest in the Company, Employee hereby irrevocably conveys, transfers and assigns to the Company, all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of Employee's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to

the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom. In addition, Employee hereby waives any so-called "moral rights" with respect to the Inventions. To the extent that Employee has any rights in the results and proceeds of Employee's service to the Company that cannot be assigned in the manner described herein, Employee agrees to unconditionally waive the enforcement of such rights. Employee hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents and other registrations for intellectual property that may issue thereon, including, without limitation, any rights that would otherwise accrue to Employee's benefit by virtue of Employee being an employee of or other service provider to the Company.

(iii)    Limited Licenses

(A)    If Employee incorporates into a Company product, process, system, code, or machine or into any Invention any Ideas that are not Inventions and that Employee owns or otherwise has rights in ("**Employee IP**"), Employee hereby grants to Company a non-exclusive, royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Employee IP as part of or in connection with such product, process, system, code, machine or Invention.

(B)    For any Invention that Employee can demonstrate with contemporaneous evidence is reduced to practice, created, invented, designed, developed, contributed to or improved without Employee's use of any Company resources and outside the scope of Employee's work with the Company, the Company grants to Employee a non-exclusive, royalty-free, perpetual, worldwide license to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Invention solely outside of the Company's Exclusive Fields of Use (defined below) and subject the Company's Right of First Offer (also defined below) (each a "**Licensed Invention**"). The **Company's Exclusive Fields of Use** means industries, technologies, research and development related to insurance; insurance claims; insurtech; insurance claim service providers; property restoration or remediation; construction, repair, or property financing; and any data or data analytics related to the foregoing fields.

(C)    Before Employee solicits interest in any transaction, or enters into a bona fide discussion regarding the definitive terms and conditions of any transaction, the effect of which is to sell, transfer, or sublicense any rights to any Licensed Invention, the Employee shall promptly notify the Company. The Employee's notice will identify the specific Licensed Invention(s) that would be the subject of the sale, transfer, or sublicense and the identity of a prospective purchaser. Upon receipt of such notice, the Company will have ten (10) days (the "**ROFO Notice Period**") to notify the Employee if it is interested in exercising its right of first offer with respect to any or all of the designated Licensed Inventions. If the Company so notifies the Employee during such period, then the parties will negotiate with one another in good faith exclusively for a period of sixty (60) days (the "**ROFO Negotiation Period**") regarding the terms and conditions pursuant to which Company would acquire Employee's rights to Licensed Inventions, and the Employee will not negotiate with any third party for the sale or transfer of such Licensed Inventions during the ROFO Negotiation Period. If the Company does not notify the Employee that it is exercising its right of first offer during the ROFO Notice Period, or if the Company provides such notice during ROFO Notice Period but the parties fail to agree on the terms of a sale or transfer of the applicable Licensed Invention(s) during the ROFO Negotiation Period, then after the end of the ROFO Notice Period or ROFO Negotiation Period, as the

case may be, the Employee will be free to negotiate with third parties to sell, transfer, or sublicense such Licensed Invention(s) to a third party, but only on terms and conditions (including price) that, in the aggregate, are more favorable to the Employee than those offered by the Company for the transfer of such Licensed Invention(s). If Employee does not sell, transfer, or sublicense such Licensed Invention(s) within 180 days of the end of the ROFO Notice Period or ROFO Negotiation Period, as the case may be, Employee will be obligated to comply with the obligations set forth in this 4(e)(iii)(C) with respect to any future sale, transfer, or sublicense of such Licensed Invention(s).

(f)    Rationale for and Scope of Covenants.   Employee agrees that his services hereunder are of a special, unique, extraordinary and intellectual character and his position with the Company places him in a position of confidence and trust with the customers, suppliers and executives of the Company. Employee and the Company agree that in the course of employment hereunder, Employee has and will continue to develop a personal relationship with the Company's vendors, customers or clients and other business relationships, and a knowledge of their affairs and requirements as well as confidential and proprietary information developed by the Company after the date of this Agreement.   Employee acknowledges that the Company's relationships with its established clientele may therefore be placed in Employee's hands in confidence and trust.   Employee consequently agrees that it is reasonable and necessary for the protection of the goodwill, confidential and proprietary information, and legitimate business interests of the Company and its affiliates that Employee make the covenants contained herein, that the covenants are a material inducement for the Company to employ or continue to employ Employee and to enter into this Agreement, and that the covenants are given as an integral part of and incident to this Agreement.  If any of the covenants contained in this Section 4 are held to be invalid or unenforceable due to the unreasonableness of the time, geographic area, or range of activities covered by such covenants, such covenants shall nevertheless be enforced to the maximum extent permitted by law and effective for such period of time, over such geographical area, or for such range of activities as may be determined to be reasonable by a court of competent jurisdiction and the parties hereby consent and agree that the scope of such covenants may be judicially modified, accordingly, in any proceeding brought to enforce such covenants.

(g)    Remedies. Employee consents and agrees that if he violates any covenants contained in this Section 4, the Company would sustain irreparable harm and, therefore, in addition to any other remedies which may be available to it, the Company shall be entitled to seek an injunction restraining Employee from committing or continuing any such violation of this Section 4.  Nothing in this Agreement shall be construed as prohibiting the Company or Employee from pursuing any other remedy or remedies including, without limitation, recovery of damages.  Employee acknowledges that the Company are an express third-party beneficiary of this Agreement and that they may enforce these rights as third party beneficiaries.  These restrictive covenants shall be construed as agreements independent of any other provision in this Agreement or in any other agreement.  The Company has fully performed all obligations entitling it to the restrictive covenants, and the restrictive covenants therefore are not executory or otherwise subject to rejection and are enforceable under the bankruptcy code.  In the event of the breach by Employee of any of the provisions of this Section 4, the Company shall be entitled, in addition to all other available rights and remedies, to withhold any or all of the amounts agreed to be paid to Employee hereunder and the Company shall also be entitled to terminate his employment status hereunder and the provision of any benefits and compensation conditioned upon such status.  Notwithstanding any provision of this Agreement to the contrary, Employee shall not be entitled to any payments pursuant hereto during any period in which Employee is violating any of his obligations under this Section 4.  The Company may assign the restrictive covenants set forth in this Section 4 in connection with the acquisition of all or a part of the assets of the Company, and any such assignee or successor shall be entitled to enforce the rights and remedies set forth in this Section 4.  Employee acknowledges and agrees that the Restricted Period shall be tolled on a day-

for-day basis for all periods in which Employee is found to have violated the terms of this Section 4 so that the Company receives the full benefit of such periods to which Employee has agreed.

(h)    Whistleblower Protection.  Nothing in this Agreement is intended to conflict with the whistleblower provisions of any United States federal, state or local law or regulation, including but not limited to Rule 21F-17 of the Securities Exchange Act of 1934 or § 1833(b) of the Defend Trade Secrets Act of 2016. Accordingly, notwithstanding anything to the contrary herein, nothing in this Agreement shall prohibit Employee from reporting possible violations of United States federal, state or local law or regulation to any United States federal, state or local governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or to an attorney, or from making other disclosures that are protected under the whistleblower provisions of federal law or regulation, or from disclosing trade secrets and other confidential information in the course of such reporting; provided, that Employee uses his reasonable best efforts to (i) disclose only information that is reasonably related to such possible violations or that is requested by such agency or entity and (ii) requests that such agency or entity treat such information as confidential. Employee does not need the prior authorization from the Company to make any such reports or disclosures and is not required to notify the Company that it has made such reports or disclosures. In addition, Employee has the right to disclose trade secrets and other confidential information in a document filed in a lawsuit or other proceeding; provided, that the filing is made under seal and protected from public disclosure.

(i)    Survival.  Notwithstanding anything to the contrary set forth herein, the provisions of this Section 4 shall survive the termination or cessation of this Agreement or Employee's employment, irrespective of the reason for such termination or cessation.  Employee shall disclose and hereby agrees that the Company may disclose, the restrictions set forth in this Section 4 to any subsequent employer or potential employer of Employee during the two year period following the termination of Employee's employment with the Company.

5.    Compliance with Internal Revenue Code Section 409A.

(a)    General.  It is the intention of both the Company and Employee that the benefits and rights to which Employee could be entitled pursuant to this Agreement comply with Section 409A of the Internal Revenue Code, as amended from time to time, and its implementing regulations and guidance ("***Section 409A***"), to the extent that the requirements of Section 409A are applicable thereto, and the provisions of this Agreement shall be construed in a manner consistent with that intention. If Employee or the Company believes, at any time, that any such benefit or right that is subject to Section 409A does not so comply, it shall promptly advise the other and shall negotiate reasonably and in good faith to amend the terms of such benefits and rights such that they comply with Section 409A (with the most limited possible economic effect on Employee and on the Company).

(b)    Distributions on Account of Separation from Service.  If and to the extent required to comply with Section 409A, any payment or benefit required to be paid under this Agreement on account of termination of Employee's employment, service (or any other similar term) shall be made only in connection with a "separation from service" with respect to Employee within the meaning of Section 409A.

(c)    No Acceleration of Payments.   Neither the Company nor Employee, individually or in combination, may accelerate any payment or benefit that is subject to Section 409A, except in compliance with Section 409A and the provisions of this Agreement, and no amount that is subject to Section 409A shall be paid prior to the earliest date on which it may be paid without violating Section 409A. Notwithstanding anything herein to the contrary or otherwise, except to the extent any expense or reimbursement provided pursuant to this Agreement does not constitute a "deferral of compensation" within the meaning of Section 409A (i) the amount of expenses eligible for reimbursement provided to Employee

during any calendar year will not affect the amount of expenses eligible for reimbursement or in-kind benefits provided to Employee in any other calendar year, (ii) the reimbursements for expenses for which Employee is entitled to be reimbursed shall be made on or before the last day of the calendar year following the calendar year in which the applicable expense is incurred, (iii) the right to payment or reimbursement or in-kind benefits hereunder may not be liquidated or exchanged for any other benefit.

(d)    Installment Payments. For purposes of Section 409A, Employee's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

6.    Withholding.  The Company shall be entitled to deduct or withhold from any amounts owing to Employee any federal, state, local or foreign withholding taxes, excise tax, or employment taxes imposed with respect to Employee's compensation or other payments from the Company or Employee's ownership interest in the Company or any parent thereof. To the extent that any of the payments and benefits provided for under this Agreement together with any payments or benefits under any other agreement or arrangement between the Company or its affiliates or any parent thereof and Employee (collectively, the "***280G Payments***") would constitute a "parachute payment" within the meaning of Section 280G of the Internal Revenue Code, then the Company shall use its commercially reasonable efforts to cause the Company (or such other party or parties as may be necessary) to grant the equity holder consent required to approve such 280G Payments to preclude it from being subject to the excise tax imposed pursuant to Section 4999 of the Internal Revenue Code (the "***Excise Tax***"); provided, however, that Employee shall reasonably cooperate with the Company and shall take all actions and execute such documents and instruments (including without limitation waiver of payments and benefits) as shall be reasonably necessary to preclude imposition of the Excise Tax.  In the event that the Company is not capable of granting, or such other parties do not grant, the stockholder consent required to preclude the 280G Payments from being subject to the Excise Tax, or Employee does not take any action required to be taken by Employee to preclude the imposition of the Excise Tax, then the amount of the 280G Payments shall be reduced to the amount that would result in no imposition of the Excise Tax.

7.    Miscellaneous.

(a)    Submission to Jurisdiction; Consent to Service of Process.    Each party hereby expressly and irrevocably submits to the exclusive jurisdiction and exclusive venue of any federal or state court of competent jurisdiction located in the State of Louisiana for any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto shall be heard and determined in such courts.  Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection that such party may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each party hereby waives any defense of lack of personal jurisdiction in Louisiana. Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Entire Agreement; Amendments and Waivers.  This Agreement (including any schedules and exhibits hereto) and the agreements referenced herein or contemplated hereby represent the entire understanding and agreement between the parties hereto with respect to Employee's employment with the Company and can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by Employee, in the case of an amendment, supplement, modification or waiver sought to be enforced against Employee, or the

Company (other than an instrument signed by Employee on the Company's behalf), in the case of an amendment, supplement, modification or waiver sought to be enforced against the Company. The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law. The parties agree that this Agreement is intended to, and hereby does, supersede any previous employment agreement(s) or arrangement(s) between Employee and the Company.

(c)     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana without regard to conflicts of law principles thereof.

(d)     Section Headings. The section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

(e)     Notices. All notices and other communications under this Agreement shall be deemed to have been duly given (a) on the date of delivery, if delivered by hand, (b) on the date of transmission, if delivered by confirmed email, (c) on the first business day following the date of deposit, if delivered by guaranteed overnight delivery service, or (d) on the fourth business day following the date delivered or mailed by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Employee, to:

Harrison Fox
hxfox1@gmail.com

At the address shown in the books and records of the Company

If to Company, to:

Alston Walker
alston@brelly.com

AND

Will Bishop
william.bishop@phelps.com
365 Canal St # 2000, New Orleans, LA 70130

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

(f)     Severability. If any provision of this Agreement is invalid, illegal or unenforceable, the balance of this Agreement shall remain in effect. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(g)    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile, .pdf or other electronic means shall be effective as delivery of a manually executed counterpart to the Agreement.

(h)    Remedies Cumulative.  Except as otherwise provided herein, no remedy herein conferred upon a party hereto is intended to be exclusive of any other remedy.  No single or partial exercise by a party hereto of any right, power or remedy hereunder shall preclude any other or further exercise thereof.  All remedies under this Agreement or otherwise afforded to any party, shall be cumulative and not alternative.

(i)    Interpretation.  When a reference is made in this Agreement to an article, section, paragraph, clause, schedule or exhibit, such reference shall be deemed to be to this Agreement unless otherwise indicated.  The text of all schedules is incorporated herein by reference.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  As used herein, words in the singular will be held to include the plural and vice versa (unless the context otherwise requires), words of one gender shall be held to include the other gender (or the neuter) as the context requires, and the terms "hereof", "herein", and "herewith" and words of similar import will, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(j)    Arm's Length Negotiations.  Each party herein expressly represents and warrants to all other parties hereto that (i) said party has had the opportunity to seek and has obtained the advice of its own legal, tax and business advisors before executing this Agreement, and (ii) this Agreement is the result of arm's length negotiations conducted by and among the parties hereto and their respective counsel.

(k)    Construction.  The parties hereto agree and acknowledge that they have jointly participated in the negotiation and drafting of this Agreement.  In the event of an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement.

(l)    Further Instruments and Actions.  The parties hereto agree to execute such further instruments and to take such further actions as may reasonably be necessary to carry out the intent of this Agreement.

(m)    Binding Effect; Assignment; Third-Party Beneficiaries.  Except as otherwise provided herein, this Agreement shall not be assigned by any party, and no party's obligations hereunder, or any of them, shall be delegated, without the consent of the other parties; provided that, the Company may assign this Agreement to any successor to all or substantially all of the business and/or assets of the Company, provided that the Company shall require such successor to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  Subject to the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.  There shall be no third party beneficiaries hereof except as expressly provided herein.

(n)    Representation by Employee.  Employee represents and warrants to the Company that he is not (and that he shall not become) a party to any agreement containing a non-competition provision or other restriction with respect to (i) the nature of any services or business which he is entitled or required

to perform or conduct for the Company under this Agreement, or (ii) the disclosure or use of any information which directly or indirectly relates to the nature of the business of the Company or the services to be rendered by Employee under this Agreement.  Employee further represents and warrants that the execution, delivery and performance of this Agreement by Employee does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Employee is a party or by which Employee is bound. Employee agrees not to enter into any agreement which would be inconsistent with any of the terms or conditions hereof.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the date first written above.

**INSURANCE CLAIMS SERVICES, INC:**                    **EMPLOYEE:**

                                                       **Harrison Fox**

By: _Tobias Patch (Jul 25, 2023 17:02 CDT)_____    Signature: _Harrison Fox (Mar 30, 2023 14:30 GMT+2)_____

Name: Tobias Patch_____

Title: CEO_____    Date: Mar 30, 2023_____

Date: Jul 25, 2023_____

[Signature Page to Employment Agreement – R. Stephens]

PD.39718868.3

## EXHIBIT A – COMPENSATION

Beginning on the first full calendar month in which Employee is considered to be performing services under this Agreement Full-Time, Compensation shall be $87,500, annualized per year, for the first twenty-four (24) calendar months. After the expiration of twenty-four (24) calendar months, Employee's Full-Time compensation shall be reviewed by the CEO. Notwithstanding, Employee's Full-Time Compensation shall be eligible to be increased as determined by the CEO in his sole discretion.  All Compensation shall be subject to customary withholding and other appropriate deductions.

For the purposes of Compensation, Employee is deemed to be performing services "***Full-Time***" during the period in which Employee is exclusively working for the Company and not working directly or indirectly for third parties, or on his own account, even when the activities that could be carried out are not concurrent with those of the Company and even when such activities could be carried out outside of Employee's normal working hours; provided, however, that Employee is permitted to conclude the following existing obligations for the periods and times stated below.

| Client and Description | Remaining Obligation |
|---|---|
| Meli - Electronic will for items and media: | Approximately 25-50 hours total to be concluded before the end of 2024. |
| Dog House Nola - Dog friendly bar with app to open a dog park | Approximately 30 hours total. |

In addition, Employee may have the opportunity to spend about 80 hours building a website for Pan American Building.  Employee will accept this engagement only with Company's written consent.

Exhibit A

# Harrison Fox Employment Agreement (Clean 3.29.23)

Final Audit Report                                           2023-07-25

| | |
|---|---|
| Created: | 2023-03-29 |
| By: | Alston Walker (alston@brelly.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAJ8o6o-66lzcUhE6kAbsiO45JS7JdpFhT |

## "Harrison Fox Employment Agreement (Clean 3.29.23)" History

Document created by Alston Walker (alston@brelly.com)
2023-03-29 - 7:19:15 PM GMT

Document emailed to harry@brelly.com for signature
2023-03-29 - 7:20:08 PM GMT

Email viewed by harry@brelly.com
2023-03-30 - 12:30:20 PM GMT

Signer harry@brelly.com entered name at signing as Harrison Fox
2023-03-30 - 12:30:44 PM GMT

Document e-signed by Harrison Fox (harry@brelly.com)
Signature Date: 2023-03-30 - 12:30:46 PM GMT - Time Source: server

Document emailed to Tobias Patch (tobias@brelly.com) for signature
2023-03-30 - 12:30:47 PM GMT

Email viewed by Tobias Patch (tobias@brelly.com)
2023-07-25 - 10:01:10 PM GMT

New document URL requested by Tobias Patch (tobias@brelly.com)
2023-07-25 - 10:01:16 PM GMT

Document e-signed by Tobias Patch (tobias@brelly.com)
Signature Date: 2023-07-25 - 10:02:07 PM GMT - Time Source: server

Agreement completed.
2023-07-25 - 10:02:07 PM GMT

**Adobe Acrobat Sign**

**INSURANCE CLAIM SERVICES INC.**

**CONFIDENTIAL INFORMATION AND
INVENTION ASSIGNMENT AGREEMENT** ·

*Employee Name:* **Tobias Patch**

*Effective Date:* **March 2, 2022**

As a condition of my becoming employed (or my employment being continued) by Insurance Claim Services Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, the receipt of Confidential Information (as defined below) while associated with the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I agree to the following:

1.     **Relationship.** This Confidential Information and Invention Assignment Agreement (this "Agreement") will apply to my employment relationship with the Company. If that relationship ends and the Company, within a year thereafter, either reemploys me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing. Any such employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2.     **Confidential Information.**

(a)     **Protection of Information.** I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I further agree not to make copies of such Confidential Information except as authorized by the Company.

(b)     **Confidential Information.** I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to

PD.37062001.1

the Company in confidence by third parties.  Confidential Information includes, without limitation:  (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(c)   **Third Party Information.**  My agreements in this Section 2 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence. I further agree that, during the term of the Relationship and thereafter, I will not improperly use or disclose to the Company any confidential, proprietary or secret information of my former employer(s) or any other person, and I agree not to bring any such information onto the Company's property or place of business.

(d)   **Other Rights.**  This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

(e)   **U.S. Defend Trade Secrets Act.**  Notwithstanding the foregoing, the U.S. Defend Trade Secrets Act of 2016 ("DTSA") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (iii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

PD.37062001.1

3.    **Ownership of Inventions.**

(a)    **Inventions Retained and Licensed.**  I have attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date:  (i) I made, and/or (ii) belong solely to me or belong to me jointly with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on Exhibit A, I hereby forever waive any and all rights or claims of ownership to such Inventions.  I understand that my listing of any Inventions on Exhibit A does not constitute an acknowledgement by the Company of the existence or extent of such Inventions, nor of my ownership of such Inventions.  I further understand that I must receive the formal approval of the Company before commencing my Relationship with the Company.

(b)    **Use or Incorporation of Inventions.**  If in the course of the Relationship, I use or incorporate into a product, service, process or machine any Invention not covered by Section 3(d) of this Agreement in which I have an interest, I will promptly so inform the Company in writing.  Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c)    **Inventions.**  I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable.  I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon.  I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship, except as otherwise provided in Section 3(g) below.

(d)    **Assignment of Company Inventions.**  I hereby assign to the Company, or its designee, and I agree that I will promptly make full written disclosure to the Company of and to hold in trust for the sole right and benefit of the Company, all my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein.  I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature

-3-

whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

(e)    **Maintenance of Records.** I agree to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. I agree to deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Sections 4 and 5.

(f)    **Patent and Copyright Rights.** I agree to assist the Company, or its designee, at its expense, in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and agree never to assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application

-4-

for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

(g)    **Exception to Assignments.**  Subject to the requirements of applicable state law, if any, I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any, attached hereto as Exhibit B. In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and for a period of twelve (12) months immediately following the termination of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

4.    **Company Property; Returning Company Documents.**  I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

5.    **Termination Certification.**  In the event of the termination of the Relationship, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.

6.    **Notice to Third Parties.**  I agree that during the periods of time during which I am restricted in taking certain actions by the terms of this Agreement (the "Restriction Period"), I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement. I also understand and agree that the Company may, with or without prior notice to me and during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement. I further agree that, upon written request by the Company, I will respond to the Company in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

-5-

7.      **Solicitation of Employees, Consultants and Other Parties.** As described above, I acknowledge and agree that the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others, and that I will not use or disclose such Confidential Information except as authorized by the Company. I further agree as follows:

(a)      **Employees, Consultants.** I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

(b)      **Other Parties.** I agree that during the term of the Relationship, I will not negatively influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

8.      **At-Will Relationship.** I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between the Company and me, my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly continue in effect after the termination of the Relationship.

9.      **Representations and Covenants.**

(a)      **Facilitation of Agreement.** I agree to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

(b)      **No Conflicts.** I represent that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship. I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party. I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party. I acknowledge and agree that I have listed on

-6-

Exhibit A all agreements (*e.g.,* non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company.  I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

(c)    **Voluntary Execution.**  I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

10.    **Electronic Delivery.**  Nothing herein is intended to imply a right to participate in any of the Company's equity incentive plans, however, if I do participate in such plan(s), the Company may, in its sole discretion, decide to deliver any documents related to my participation in the Company's equity incentive plan(s) by electronic means or to request my consent to participate in such plan(s) by electronic means.  I hereby consent to receive such documents by electronic delivery and agree, if applicable, to participate in such plan(s) through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

11.    **Miscellaneous.**

(a)    **Governing Law.**  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to the principles of conflict of laws.

(b)    **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us.  No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement.  The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

-7-

(c)    **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(d)    **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(e)    **Severability.** If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected. The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information, and to limit my right to solicit employees and customers only to the extent necessary to protect the Company from unfair competition. Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 7 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

(f)    **Remedies.** I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

(g)    **Advice of Counsel.** I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

(h)    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be

-8-

-9-

deemed an original, and all of which together shall constitute one and the same agreement.

*[Signature Page Follows]*

PD.37062001.1

The parties have executed this Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**THE COMPANY:**

**INSURANCE CLAIM SERVICES INC.**

By: _____ 3-2-22
      Tobias Patch, CEO

2425 Ryan Drive
Alvin, TX 77511

-10-

PD.37062001.1

-11-

The parties have executed this Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**EMPLOYEE:**

**TOBIAS PATCH**

_____ 3-2-22

2425 Ryan Drive
Alvin, TX 77511

(512) 981 - 8091 (phone)

tobias@getclaimly.com

-11-

PD.37062001.1

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP
### EXCLUDED UNDER SECTION 3(a) AND CONFLICTING AGREEMENTS
### DISCLOSED UNDER SECTION 9(b)

The following is a list of (i) all Inventions that, as of the Effective Date: (A) I made, and/or (B) belong solely to me or belong to me jointly with others or in which I have an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company and (ii) all agreements, if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company:

Prior Inventions:
> None

Prior Agreements:
> None

*[Signature Page Follows]*

PD.37062001.1

-2-

Except as indicated above on this Exhibit A, I have no inventions, improvements or original works to disclose pursuant to Section 3(a) of this Agreement and no agreements to disclose pursuant to Section 9(b) of this Agreement.

**EMPLOYEE:**

**TOBIAS PATCH**

_T Patch_     3-2-22

2425 Ryan Drive
Alvin, TX 77511

(512) 981 - 8091 (phone)

tobias@getclaimly.com

PD.37062001.1

## EXHIBIT B

**Section 2870 of the California Labor Code is as follows:**

(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**Chapter 765, Section 1060/2 of the Illinois Compiled Statutes is as follows:**

(1)    A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this State and is to that extent void and unenforceable. The employee shall bear the burden of proof in establishing that his invention qualifies under this subsection.

(2)    An employer shall not require a provision made void and unenforceable by subsection (1) of this Section as a condition of employment or continuing employment. This Act shall not preempt existing common law applicable to any shop rights of employers with respect to employees who have not signed an employment agreement.

(3)    If an employment agreement entered into after January 1, 1984, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or

demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

**Sections 44-130 of the Kansas Labor and Industries Code is as follows:**

(a)    Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facilities or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

(1)    The invention relates to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)    the invention results from any work performed by the employee for the employer.

(b)    Any provision in an employment agreement which purports to apply to an invention which it is prohibited from applying to under subsection (a), is to that extent against the public policy of this state and is to that extent void and unenforceable. No employer shall require a provision made void and unenforceable by this section as a condition of employment or continuing employment.

**Section 181.78, Subdivision 3 of the Minnesota Labor, Industry Code is as follows:**

(c)    If an employment agreement contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer shall provide, at the time the agreement is made, a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

(1)    The invention relates directly to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)    The invention results from any work performed by the employee for the employer.

(d)    Even though the employee meets the burden of proving the conditions specified in this section, the employee shall disclose, at the time of employment or thereafter, all inventions being developed by the employee, for the purpose of determining employer and employee rights in an invention.

**Section 49.44.140 of the Revised Code of Washington is as follows:**

(1)    A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

(2)    An employer shall not require a provision made void and unenforceable by subsection (1) of this section as a condition of employment or continuing employment.

(3)    If an employment agreement entered into after September 1, 1979, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

PD.37062001.1

## EXHIBIT C

## TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Insurance Claim Services Inc., a Delaware corporation, its subsidiaries, affiliates, successors or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement, and I acknowledge my continuing obligations under that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months immediately following the termination of my Relationship with the Company, I shall not either directly or indirectly solicit any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit employees or consultants of the Company, either for myself or for any other person or entity.

Further, I agree that I shall not use any Confidential Information of the Company to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

**EMPLOYEE:** Tobias Patch

Signature: _____     Date: _____